**Walter HILLMAN, Plaintiff,**

v.

**SAFECO INSURANCE COMPANY OF AMERICA Defendant.**

No. 5:01–CV–1943.

United States District Court,
N.D. Ohio,
Eastern Division.

March 11, 2002.

John F. Hill, Scanlon & Gearinger, Joy D. Malek, Scanlon & Gearinger, Akron, for Walter Hillman, Plaintiffs.

Brian W. Bulger, Meckler, Bulger & Tilson, Joan E. Maloney, Meckler, Bulger & Tilson, Chicago, IL, Timothy F. Sweeney, Cleveland, for Safeco Insurance Company of America, Defendants.

## OPINION

GWIN, District Judge.

On December 14, 2001, Defendant Safeco Insurance Company of America ("Safeco") filed a motion for summary judgment (Doc. 38) on the claims set forth in Plaintiff Walter Hillman's first amended complaint (Doc. 19). Plaintiff Hillman's amended complaint makes three claims for relief. The first claim alleges age discrimination in violation of the Ohio Revised Code. *See* Ohio Rev.Code § 4112 .01, .02, .99 (2001). The second claim alleges intentional infliction of emotional distress. The plaintiff's third claim alleges wrongful termination. Hillman originally brought this case in state court. Claiming diversity jurisdiction under 28 U.S.C. § 1332(a)(1) (2001), the defendants removed the case to this Court.

In deciding this motion for summary judgment, the Court must decide whether genuine issues of material fact exist as to any of the plaintiff's claims or whether the defendant is entitled to judgment as a matter of law. The Court finds that Plaintiff Hillman cannot establish elements necessary to his claims for age discrimination, intentional infliction of emotional distress, and wrongful termination. Accordingly, the Court grants Defendant Safeco's motion for summary judgment.

### I. Background

#### A. Description of the Arguments

Plaintiff Hillman claims that Safeco discriminated against him based on his age, intentionally inflicted severe emotional distress, and wrongfully discharged him from his position as a claims representative. Hillman says that Safeco's treatment of him by, among other things, increasing his workload, placing him on a performance plan ostensibly to improve his job performance, and making disparaging age-based comments forced him to resign his position with the company. Hillman further says that Safeco's treatment of him caused him severe emotional distress, and that by causing him to resign, Safeco wrongfully discharged him in violation of public policy.

Defendant Safeco denies Hillman's claims, saying that it did not force Hillman to resign and that legitimate, nondiscriminatory business concerns prompted its treatment of Hillman. Safeco also says that any age-related comments that Hillman's supervisors made are either too distant in time or not causally related to the reasons Hillman left Safeco. Safeco says that Hillman fails to offer any direct evidence of discrimination, fails to establish a prima facie case of age discrimination, and also cannot show the necessary elements of either tort claim. Therefore, Defendant Safeco moves for summary judgement as to all of Plaintiff Hillman's claims.

### B. Factual Background

In deciding the defendant's motion for summary judgment, the Court construes the facts and draws all reasonable inferences in the light most favorable to Plaintiff Hillman, the nonmoving party.

Plaintiff Hillman was born on September 9, 1947, and at the time of his resignation from Safeco, he was fifty-four years old. Hillman began working for Defendant Safeco in 1997 when Safeco acquired Hillman's previous employer, American States Insurance Company ("American States"). Hillman worked for American States from 1983 as a claims representative, and while working for American States, his supervisors gave him adequate performance reviews. When Safeco acquired American States, Hillman continued working as a claims representative in Safeco's northeast Ohio unit.

After Safeco took over American States, it instituted its own procedures, which included closing most of the central field offices and having claims representatives work from their homes using company cars and equipment. Once those procedures were in place, Safeco assigned Hillman to handling automobile damage claims in the field. Hillman worked as a field claims representative until he resigned on September 25, 2001, at which time he was earning $46,500 per year—an increase from the $42,019 he earned at the time Safeco acquired American States.

As a field claims representative, Hillman shared the northeast Ohio unit's largest territory with Robert Krantz. Hillman and Krantz were the oldest claims representatives in the unit. Hillman traveled throughout the territory, which covered fourteen Ohio. counties, and met with claimants, estimated damages, and negotiated with body shops or garages to determine how much Safeco would pay to repair the damaged vehicles.

For a short period of time after Safeco took over, Krantz managed Hillman. Then Valerie Kalista was Hillman's unit manager. In October 2000, Deborah Wright became Hillman's unit manager. Safeco managers evaluated claims representatives based on a variety of performance goals, including: the number of claims the representatives closed each month, the amount of claims the representatives could turnaround within three days, the use of Pathways software [1] in preparing estimates, the representatives' collision severity numbers, and their obtaining an agreed cost of repair and date of completion from the repair shop.

Hillman says that the size of his territory made it more difficult for him to handle and document as many claims as other representatives in his unit. His driving distance and time were greater. Safeco assigned him a large number of claims because of the large size of his territory, then criticized him for not completing the

---

1. Pathways software is used in the insurance industry to prepare estimates of the cost to repair a damaged automobile. A Pathways estimate includes the cost of parts and labor. Safeco supplies the Pathways software package to its field claims representatives.

claims quickly enough. Hillman also says his productivity numbers were lower than other representatives because Safeco often assigned overlapping tasks to him and Krantz. Without knowing about the overlap in assignment, the two men would both drive to the same location.[2] Hillman says that this happened frequently. Safeco also asked Hillman to help manage its system of direct repair garages and to coordinate a salvage program—duties that took time away from handling claims.

In April 1999, Hillman began receiving treatment for work-related stress. When his stress increased to the point of causing him chest pain, his doctor instructed him to take off work from April 17, 2000 until May 1, 2000. He returned to work after that leave. After returning to work in May 2000, Hillman and Krantz met with Safeco management to suggest how their territory could be reasonably handled. Safeco management did not adopt their suggestions, and the procedures to handle the territory did not change. Both Hillman and Krantz took prescription medicine to deal with work-related stress.

At his annual performance review in August 2000, Hillman's manager, Kalista, rated his overall performance as satisfactory, but rated his "achievement" as unsatisfactory. Specifically, Kalista informed him that it was critical he improve his performance in Safeco's core claims-handling requirements such as using the Pathways program to prepare estimates, achieving a three-day completion time on a percentage of his assignments, and following directions about his assignments from the inside claims representatives at the regional headquarters in Cincinnati.

Hillman did not score well in December 2000, when a sampling of his work yielded the second lowest score in a region-wide sampling of all field claims representatives handling automobile claims. Therefore, on January 10, 2001, Safeco placed Hillman on an action plan designed to address ongoing problems with his performance. Wright gave Hillman a memorandum in which she detailed the requirements of this performance plan. She outlined four categories in which Hillman's work required improvement: use of the Pathways software, amount of claims closed within three days, Estimate 2000 success rate, and severity numbers. Hillman's June 1999 and August 2000 performance reviews generally supported Wright's conclusion that Hillman had ongoing problems with these areas.

In Wright's memorandum to Hillman detailing the goals of the plan, she indicated that Hillman agreed upon the goals set and found them attainable. The plan stated that if Hillman did not "reach the above listed goals, it [would] be necessary to escalate the performance review to the next level. The result of the escalation [could] be a reduction in claim payment authority, a reduction in salary or possible termination of your employment with SAFECO." (Def.'s Mot. Summ. J. Ex. 7.)

Subsequent reviews of his work showed that Hillman's severity numbers greatly improved during the time he was on the performance plan. However, he did not show as much improvement in the other categories. Hillman attributes Safeco's negative evaluation of his performance to a misleading and inaccurate review of his

---

**2.** In his deposition, Plaintiff Hillman described the overlapping assignments. Hillman stated,

> We had such a large territory to cover that it was next to impossible to cover it by two adjusters.... I mean we would both be

sent to Youngstown to handle a claim. Whereas, if both of those claims were given to one person they could handle that and the other person could go the other end of the territory and handle something else. (Hillman Dep. at 90.)

work. Hillman says the samples used by Safeco of his work product made up only a small percentage of his total work product and did not accurately represent the quality of his work. Further, Hillman says that the large size of the territory to which Safeco assigned him made it more difficult for him to be as efficient as other claims representatives in smaller territories. Hillman also says that Safeco overloaded him with work until he was unable to meet deadlines and fulfill performance goals.

Hillman met with Wright in March 2001 to follow up on his performance under the action plan. Shortly after this meeting, work-related stress caused Hillman to suffer headaches, chest pains, and panic attacks. Hillman required prescription medicine to deal with the stress. His physician put him on a medical leave of absence beginning April 3, 2001. While on leave, Safeco paid Hillman his regular salary. Shortly before his the expiration of his leave and benefits, Hillman resigned from Safeco. Approximately three months before his resignation, he instituted the present suit.

## II. Summary Judgment Standard

Summary judgment is appropriate when the evidence submitted show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *See Waters v. City of Morristown,* 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *See Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 597 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *See id.*

In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *See Nat'l Enters. v. Smith,* 114 F.3d 561, 563 (6th Cir.1997). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All–Lock Co.,* 96 F.3d 174, 176–78 (6th Cir.1996) (internal quotation marks omitted).

## III. Discussion

### A. Age Discrimination Claim

Plaintiff Hillman brings his age discrimination claim under section 4112.02 of the Ohio Revised Code. *See* Ohio Rev.Code § 4112.02 (2001). For age discrimination claims, Ohio courts follow the federal guidelines and requirements. *See, e.g., Ahern v. Ameritech Corp.,* 137 Ohio App.3d 754, 769, 739 N.E.2d 1184, 1194 (2000) ("The Ohio Supreme Court has held that age discrimination cases brought in state courts should be construed and decided in accordance with the federal guidelines and requirements."); *Mauzy v. Kelly Servs., Inc.,* 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996); *Byrnes v. LCI Communication Holdings Co.,* 77 Ohio St.3d 125, 128, 672 N.E.2d 145, 148 (1996) (noting that the *Mauzy* court clarified the methods for establishing a prima facie case of age discrimination under section 4112.14 of the Ohio Revised Code and that the same methods apply to section 4112.02, which is at issue here); *Barker v. Scovill, Inc.,* 6

Ohio St.3d 146, 147–48, 451 N.E.2d 807, 808–09 (1983) (applying the framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to an age discrimination claim under Ohio law), *modified, Kohmescher v. Kroger Co.,* 61 Ohio St.3d 501, 575 N.E.2d 439 (1991).

Ohio courts adopted the *McDonnell Douglas* tripartite test for analyzing discrimination claims. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n,* 66 Ohio St.2d 192, 197, 421 N.E.2d 128, 131 (1981) (adopting the *McDonnell Douglas* standards for discrimination claims); *Barker,* 6 Ohio St.3d at 147–48, 451 N.E.2d at 808–09 (applying the *McDonnell Douglas* standards to an age discrimination claim). Under this framework, the plaintiff must first show a prima facie case of discrimination, which gives rise to a presumption of discrimination. The burden then shifts to the defendant to rebut the presumption by offering a legitimate, nondiscriminatory reason for the plaintiff's discharge. Finally, the plaintiff must show that the defendant's proffered reason for discharge is a pretext for discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817; *Barker v. Scovill, Inc.,* 6 Ohio St.3d at 147–48, 451 N.E.2d at 809–10.

Hillman can establish a prima facie case of age discrimination either by providing direct evidence of discrimination or by the indirect method set forth in *McDonnell Douglas.* A "plaintiff may establish a prima facie case [of age discrimination] directly by presenting evidence, of any nature, to show that the employer more likely than not was motivated by discriminatory animus." *Mauzy,* 75 Ohio St.3d at 586–87, 664 N.E.2d at 1279; *see also Ahern,* 137 Ohio App.3d at 770, 739 N.E.2d at 1194. Absent direct evidence, a plaintiff may establish a prima facie case by following the standard established in *McDonnell Douglas.* *See Byrnes,* 77 Ohio St.3d at 128, 672 N.E.2d at 148 ("Discriminatory intent may be established indirectly by the four-part analysis set forth in *Barker v. Scovill* adopted from the standards established in *McDonnell Douglas.*" (internal citations omitted)).

Here, Hillman attempts to establish a prima facie case both by offering direct evidence and by satisfying the test set forth in *Barker* adopted from the *McDonnell Douglas* standards.

1. Prima Facie Case: Direct Evidence

Hillman offers direct evidence that his supervisors, Don Freihoefer, Valerie Kalista, and Deborah Wright, made age-related remakes while acting as his unit manager. Hillman says that these remarks establish Safeco's discriminatory intent in discharging him.

Hillman says that in August 1998, Freihoefer, then his unit manager, made an age-related remark regarding the retirement of Gary Lynn. Lynn was a former American States manager who decided to retire not long after Safeco acquired American States. Freihoefer said to Hillman, with others present, "We have gotten rid of Gary, now we have to get rid of you and Bob [Krantz]." (Hillman Dep. at 105; Saint–Amand Dep. at 21.) Valerie Kalista was Hillman's manager from September 1999 until late summer 2000 and at the time was thirty-three years old. During that time period, Kalista made several comments to Hillman that "older people can't handle changes." (Hillman Dep. at 125–26.) Additionally, Hillman referred to Kalista as "kiddo," and Kalista in turn referred to Hillman as "dad." (Hillman Dep. at 135.)

Deborah Wright became Hillman's unit manager in October 2000 and was his manager through the time of his resignation. Wright, thirty-five years old at the time,

made several age-related comments to Hillman and other Safeco employees while managing Hillman. She told Hillman that "older people have a difficult time with this job," that "you older guys have a tough time with the [computer] system," and that the older employees have a more difficult time with change. (Hillman Dep. at 138–41.) While Hillman and Krantz were on a business trip on February 26, 2001, Krantz spoke on the telephone with Wright regarding a proposed meeting time of between 5:00 pm and 5:30 pm. Wright responded to Krantz by saying, "You old guys have to eat at an early time." Krantz told Hillman about Wright's response. (Hillman Dep. at 122.)

■ For direct evidence to show discriminatory intent, a plaintiff "must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination ...." *Byrnes*, 77 Ohio St.3d at 130, 672 N.E.2d at 149. Vague or isolated comments that are unrelated to the plaintiff cannot support a finding of age discrimination in violation of section 4112.02 of the Ohio Revised Code. *See id.*

The Sixth Circuit in *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994), articulated factors to consider when deciding whether age-related comments show employer bias. Four factors that affect whether an employer's comments are actionable bias in an age discrimination case are:

whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination.

*Id.* at 1330.

■ Hillman does not show the necessary causal link or nexus between the statements of his supervisors and the termination of his employment with Safeco. Safeco placed Hillman on the performance plan in January 2001, and Hillman resigned in September 2001. Freihoefer and Kalista made their age-related remarks in 1998, 1999, and the beginning half of 2000. Neither Freihoefer nor Kalista managed Hillman at the time Safeco placed him on the performance plan or at the time of his resignation. Though Freihoefer and Kalista both managed Hillman at the time they made the age-related comments, the remarks themselves are distant in time and fact from the termination of Plaintiff Hillman's employment with Safeco. Hillman cannot show that these remarks were proximate in time to his termination or were causally linked to his decision to resign. Therefore, the remarks of Freihoefer and Kalista, while in poor taste, are not direct evidence of discriminatory intent.

■ Hillman similarly fails to show the proper causal link between Wright's age-related comments and the termination of his employment. Like Freihoefer and Kalista, Wright managed Hillman at the time she made age-related comments. However, unlike Hillman's previous managers, Wright's comments were proximate in time to Hillman's resignation because Wright continued to manage Hillman up until he resigned. She made her comments between October 2000 and September 2001, when Hillman resigned. Though proximate in time, the comments nevertheless lack the proper causal link to Hillman's decision to resign. Hillman also cannot show that Wright's comments were more than isolated and vague. Therefore, Wright's remarks also cannot serve as direct evidence of discrimination.

Without direct evidence to prove discriminatory intent, Hillman must establish his prima facie case through the indirect

method set forth by the Ohio Supreme Court in *Barker*.

## 2. Prima Facie Case: The *Barker v. Scovill* Test

In *Barker*, the Ohio Supreme Court applied the *McDonnell Douglas* framework to age discrimination claims brought under state law. *See Barker*, 6 Ohio St.3d at 147–48, 451 N.E.2d at 809. To prove a prima facie case of age discrimination under the *McDonnell Douglas* analysis, a plaintiff must show: " '(1) that he was a member of the protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class.[3] " *Byrnes*, 77 Ohio St.3d at 128, 672 N.E.2d at 148 (quoting *Barker*, 6 Ohio St.3d at 148, 451 N.E.2d at 809).

At fifty-four years old, Plaintiff Hillman is indisputably a member of the protected class. The parties also do not dispute that Hillman was qualified for the position. Therefore, the only elements of the prima facie case at issue are whether Safeco discharged Hillman and whether it replaced him with someone outside the protected class.

Because Hillman resigned from Safeco, he cannot satisfy the second element of the *Barker* test unless he can show that his resignation was involuntary. Although an employee resigns, he can satisfy the discharge requirement by proving constructive discharge. In determining whether a plaintiff shows constructive discharge, the Court applies an objective test. A constructive discharge occurs when "the employer's actions [make] working conditions so intolerable that a reasonable person under the circumstances would [feel] com-

pelled to resign." *Mauzy*, 75 Ohio St.3d at 588–89, 664 N.E.2d at 1280–81; *Mayo v. Kenwood Country Club, Inc.*, 134 Ohio App.3d 336, 342, 731 N.E.2d 190, 194 (1999). "The impact of the conditions must be reasonably foreseeable by the employer to give rise to a constructive discharge." *C. Vannoy v. OCSEA Local 11*, 36 F.Supp.2d 1018, 1024 (S.D.Ohio 1999); *see also Mayo*, 134 Ohio App.3d at 342, 731 N.E.2d at 194.

The *Mauzy* court provided guidance for courts applying the test for constructive discharge:

> In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group.

*Mauzy*, 75 Ohio St.3d at 589, 664 N.E.2d at 1281; *see also Starner v. Guardian Indus.*, 143 Ohio App.3d 461, 478–80, 758 N.E.2d 270, 284 (2001); *Mayo*, 134 Ohio App.3d at 342, 731 N.E.2d at 194.

When an employer presents an employee with "legitimate options for continued employment," that generally "precludes a finding of constructive discharge." *C. Vannoy*, 36 F.Supp.2d at 1024. Therefore, when an "employer gives an employee a realistic option of improving his or her situation, and the work environment is not

---

**3.** The U.S. Supreme Court in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), modified the fourth requirement slightly to

include the replacement of an employee by a person not outside the protected class, but nevertheless substantially younger. *See id.* at 311–12, 116 S.Ct. 1307.

otherwise unreasonably intolerable, the employee cannot claim that he or she was forced to retire." *Id.* at 1024 (citing *Peecook v. N.W. Nat'l Ins. Group*, No. 96–4318, 1998 WL 476245, at *3 (6th Cir. Aug.3, 1998) (unpublished)).

■ To establish constructive discharge, the employee must first show that the work environment was "otherwise unreasonably intolerable," *id.*, such that "a reasonable person under the circumstances would [feel] compelled to resign." *Mauzy*, 75 Ohio St.3d at 589, 664 N.E.2d at 1281. When considering Hillman's evidence in light of the factors listed in *Mauzy*, Plaintiff Hillman cannot make such a showing.

Safeco did not reduce Hillman's territory or decrease his responsibilities. Rather, Hillman's manager, Kalista, presented Hillman with additional responsibilities to increase his chances of promotion to senior claims adjuster. (Def.'s Mem. Supp. Summ. J. Ex. 9.) While Kalista and Freihoefer rated Hillman less than satisfactory in some performance categories on his annual evaluations, they indicated that overall they were satisfied with his performance during the review period. (Def.'s Mem. Supp. Summ. J. Exs. 5, 6.) Hillman does not allege that Safeco inquired into his retirement intentions. Wright's comments that newer employees handled change and the computer system better than the older employees, when viewed in the light most favorable to Hillman, might express a preference for people outside the protected class. However, even when viewed as such, the cumulative effect of Safeco's actions does not rise to a level that would cause a reasonable employee to feel compelled to resign.

As evidence of the intolerable nature of his workplace, Hillman indicates that he received treatment for work-related stress, including a medical leave of absence. He says that the stress of repeated and cumulative comments demeaning his age along with undue criticism of his performance caused him headaches and chest pains.

Safeco did not immediately attempt to get rid of Hillman when problems with his performance first arose. By placing him on a performance plan, Safeco attempted to correct the problems it perceived with Hillman's performance. Even though only a small percentage of people placed on the performance plan still remain employed by Safeco, being placed on a such a plan does not necessarily indicate that termination is imminent. *See Peecook*, 1998 WL 476245, at *3; *Baer v. Scotts Co.*, No. 01AP–323, 2001 WL 1548759, at *7 (Ohio Ct.App. Dec. 6, 2001) (unpublished). Between January 1, 1999, and September 25, 2001, Safeco placed twenty-three Ohio-based employees on the performance plan. Of those twenty-three employees, thirteen were over age forty and ten were under age forty. While only three of the employees that Safeco placed on a performance plan are still employed by Safeco, of those no longer employed, eight resigned and eleven were terminated. Of the three employees still working for Safeco, two of them are over age forty. (Pl.'s Mem. Opp'n Summ. J. Ex. 1.)

Safeco offered Hillman an option for continued employment when it placed him on the performance plan. Wright outlined four categories in which Hillman's performance required improvement: use of the Pathways software, amount of time to turn around a claim, Estimate 2000 success rate, and the severity amount of claims. Hillman's past performance evaluations supported Wright's conclusions that these areas generally required improvement. In 1999 and 2000, Freihoefer and Kalista indicated that Hillman required improvement in his use of the Pathways software. (Def.'s Mem. Supp. Summ. J. Exs. 5, 6.) His August 2000 evaluation showed that he was not closing enough claims in three days. (Def.'s Mem. Supp. Summ. J. Ex.

5.) Though Hillman's severity numbers improved greatly during the time he was on the performance plan, the other categories continued to be problematic.

The goals set by the performance plan were not impossible to reach, and Hillman agreed to that the goals were both reasonable and attainable. (Def.'s Mem. Supp. Summ. J. Ex. 7.) Hillman has not shown that the being placed on the performance plan created an impossible burden or indicated that his termination was imminent. *See Baer*, 2001 WL 1548759, at *7 (finding no constructive discharge when the employee did not present "evidence that the performance plan [the employer] proposed to put him on was impossible to complete" and when the failure to meet the goals of the plan could result in the employer subjecting the employee to future performance improvement plans rather than simply termination). In fact, the language of the memorandum detailing the requirements of the performance stated that, if he did not reach the listed goals, it would "be necessary to escalate the performance review to the next level. The result of that escalation can be a reduction in claim payment authority, a reduction in salary *or* possible termination of your employment." (Def.'s Mem. Supp. Summ. J. Ex. 7 (emphasis added).)

While not reaching the required goals of the plan would put Hillman's employment in jeopardy, under the circumstances, a reasonable person likely would not conclude that termination was inevitable. Rather, termination was only one possible option for failing to satisfy the requirements of the performance plan. *See Peecook*, 1998 WL 476245, at *3–4 (finding no constructive discharge despite the employer indicating that employee had only the options of meeting the performance goals within ninety days or resigning).

■ Hillman has not shown that the conditions in his workplace were unreasonably intolerable. Additionally, the option for continued employment in the performance plan precludes a finding of constructive discharge. *See, e.g., C. Vannoy*, 36 F.Supp.2d at 1024; *Peecook*, 1998 WL 476245, at *3; *Baer*, 2001 WL 1548759, at *7. Therefore, Hillman cannot show that Safeco constructively discharged him.

■ Even if Hillman could show constructive discharge, however, he cannot show that Safeco replaced him with someone substantially younger or outside the protected class. Therefore, Hillman cannot prove the fourth element of the *Barker* test. "Under *Barker*, the replacement entails the substitution of any employee outside the protected class for an employee who is a member of it." *Ahern*, 137 Ohio App.3d at 770, 739 N.E.2d at 1195. Hillman does not need to show that Safeco hired a new employee to prove that Safeco replaced him. "The employee need not be newly hired for the position. A replacement for the purposes of *Barker* may occur when the duties and responsibilities of the terminated employee are transferred to another person already employed." *Id.* at 770, 739 N.E.2d at 1195.

Plaintiff Hillman fails to establish that Safeco replaced him. First, whether the employee who fills his position is newly hired or merely reassigned, that employee nevertheless must be outside of the protected class or substantially younger than Hillman. *See Byrnes*, 77 Ohio St.3d at 129, 672 N.E.2d at 149 (finding that the employee did not meet the fourth prong of the *Barker* test because the employee was not replaced "by a person outside the statutorily protected class"). Safeco did not hire a new employee for Hillman's position, but rather reassigned his duties. One of the employees to which Safeco assigned Hillman's responsibilities was Krantz. At age fifty-four, Krantz was neither outside the statutorily protected class nor substantially younger than Hillman.

Second, courts have held that " 'a person is not replaced when ... the work is redistributed among other existing employees already performing related work.' " *Smith v. E.G. Baldwin & Assocs., Inc.*, 119 Ohio App.3d 410, 415, 695 N.E.2d 349, 352 (1997) (quoting *Atkinson v. Internat'l Technegroup, Inc.*, 106 Ohio App.3d 349, 359, 666 N.E.2d 257, 264 (1995)). When Hillman resigned, other field claims representatives assumed his duties, including Krantz, himself a member of the protected class. Therefore, Hillman cannot show that Safeco replaced him, and accordingly he cannot satisfy the fourth prong of the *McDonnell Douglas* test adopted in *Barker*.

Because Hillman neither shows direct evidence of discrimination nor establishes a prima facie case under *Barker*, Hillman's age discrimination claim fails as a matter of law. Therefore, the Court grants Defendant Safeco's motion for summary judgment as to Plaintiff Hillman's age discrimination claim.

## B. Intentional Infliction of Emotional Distress and Wrongful Discharge Claims

■ For the above reasons that Hillman cannot prove his claim of age discrimination, his claim for intentional infliction of emotional distress similarly fails. He also fails to show sufficient evidence to make out a claim for wrongful discharge. A claim for intentional infliction of emotional distress requires that the plaintiff show the defendant's "conduct was ... extreme and beyond all possible bounds of decency ... such that it can be considered as utterly intolerable in a civilized community." *Mayo*, 134 Ohio App.3d at 346–47, 731 N.E.2d at 197. For a defendant to be liable, "[g]enerally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead

him to exclaim, 'Outrageous!' " *Miller v. Premier Indus. Corp.*, 136 Ohio App.3d 662, 674, 737 N.E.2d 594, 603 (2000). Because Hillman cannot show that his work environment was so unreasonably intolerable that a reasonable person would feel compelled to resign, he cannot show sufficiently outrageous conduct on Safeco's part.

To prove a claim for wrongful discharge, Hillman must show that Safeco discharged him. *See Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 677 N.E.2d 308, 321 (1997). While this requirement would be satisfied by showing constructive discharge, as discussed above, Hillman is unable to show that Safeco's conduct forced him to resign involuntarily.

As a matter of law, Hillman cannot prove elements necessary to his claims for intentional infliction of emotional distress and wrongful discharge. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("The plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The Court accordingly grants summary judgment in favor of Safeco as to Hillman's tort claims.

## IV. Conclusion

Defendant Safeco moved for summary judgment on Plaintiff Hillman's claims for age discrimination, intentional infliction of emotional distress, and wrongful discharge. Because Hillman's claims fail as a matter of law, the Court grants Safeco's motion for summary judgment on all counts.

IT IS SO ORDERED.